v. Bankrate, Incorporated. Next case of the morning is number 1851021, Neutron Depot v. Bankrate, Incorporated. And I don't mean to get things off to a contentious footing, but I will ask Neutron Depot exactly what keeps this company litigating for now going on five years in this case. Well, begin with whatever you want, but address that at some point. Yes, sir. Let's take your time. But it's probably a good idea to lead with that. I said it's probably a good idea to take the judge's lead and lead with it. Thank you, Your Honor. May it please the Court, my name is Aaron Peacock, and I'm here on behalf of Neutron Depot, the appellant in this case, which was the plaintiff in the underlying lawsuit. In regard to your question, Your Honor, this lawsuit was filed in the Southern District of Texas in 2014. About two years after it was filed, Bankrate moved the court in the Southern District of Texas to transfer it to the Western District of Texas. We opposed. We wanted to go to trial. This was also being litigated with some other defendants. Well, one of the other defendants moved the court to go to the Western District, and the court granted it. After that – and we opposed that too – after that, Bankrate moved the court to go to the Western District of Texas. We opposed, but then in consultation with our client, we decided that it would be best to not oppose it because it would be more costly to be defending essentially what was one lawsuit that got split in two and was severed. So we decided – we let Bankrate know that initially we were opposed to it, but we then said we were unopposed to it, and it got transferred to the Western District. Well, I guess my other – my larger point is the mark here in issue says Insurance Depot, right? Correct, Your Honor. All right, and apparently Bankrate allegedly infringed the mark by using some kind of computer program that invented a million keywords. Correct, Your Honor. And all that the record shows from what I gather is that maybe 73 instances of the use – actual use of this keyword by Bankrate occurred. Is that right? I believe so. I think what we were alleging is there were 34 advertisements, I believe, that used the phrase Insurance Depot unlawfully. Correct. I believe so. And so what is the big deal? Well, Your Honor, that's infringement. Now, we – interestingly, we haven't even – this case has been litigated for a long time, like you mentioned. We haven't even been able to get to the infringement part because the opposing side, Bankrate, has filed, I believe, nine or ten dispositive motions in all this time. And the last one – well, the second to last one was the one we're here about today, the motion to dismiss for lack of standing. We've been arguing over 12B6 and all these things. We haven't even gotten to the infringement. But to answer your question, Your Honor, it's infringement. That's our contention, but we can't seem to – How long were those things up on the internet? I'm sorry? How long were the infringing items up on the internet? My understanding from the record is that they were up there for a while until Bankrate was notified. When Bankrate was notified, my understanding is Bankrate took them down. I don't know in terms of – Well, that's – well, anyway, go on with your argument. Thank you, Your Honor. What I'd like to discuss here with the court is three things. Number one, why the district court erred in its statutory standing analysis. Number two, why the district court erred in its imposition of sanctions against Neutron Depot. And number three, why the district court erred in its granting a summary judgment against Neutron Depot concerning a disgorgement of Bankrate's profits from the infringement. Now, to begin, let me add that when the lawsuit was filed in 2014, Neutron Depot was an exclusive licensee of the MARC. The MARC was owned by CSI Agency Services, Inc. Then about two and a half years later, the CSI assigned the MARC to Neutron Depot, so Neutron Depot became the assignee of the MARC. Now – You concede when Neutron Depot brought the lawsuit it lacked statutory standing. No, we do not concede that. Okay. Now, we believe that at the time of filing, Neutron Depot had statutory standing. But in regard to what we're here about today, it's irrelevant to whether at the time of filing Neutron Depot had standing or not because we amended our complaint in 2017 to allege ownership or that we were an assignee of the MARC. And this Court in the 16th Front Street case has said – Why is that irrelevant? Statutory standing is not a jurisdictional component. Statutory standing is just simply the requirement of the statute itself. You don't state a claim, which means, though, that you can't recover for this whole period of time. When you come in and sign the ownership, you still have – you've got all this early period of time you're talking about infringement where you had no right – you really weren't infringed. You had no right to enforce it. Well, Your Honor, let me back up and say that. The plaintiff, as I understand it, you go forward for some long period of time, and you finally then back up and try to give them ownership rights. When under the statute, they didn't have it during that earlier period. Hence, they can't recover for anything in that period of time. We contend we had statutory standing at the time of filing. How? Because we were an exclusive licensee. And we have a license agreement, and that was alleged in the original complaint. Now, maybe the proper terminology is not irrelevant because it is relevant at the time of filing. It's relevant at all times. What you're trying to say is that the later complaint totally superseded whatever went beyond it. But we do have cases, I'm pretty sure, which say that once you have put something in the record, it's in the record for proof purposes. This is a fact. The license agreement was attached to the earlier complaint, and the court said that wasn't enough. No, Your Honor. The license agreement – it's my understanding the license agreement was not attached to the original complaint. Well, it was in evidence somehow because the court interpreted it. Right. Well, it's in evidence because we asked the court to review it, and here's the reason why we did it. It's because they were – Bankrate was alleging in their motion that the time of filing rule applies. We were saying it does not apply, and the 16th Front Street case says it doesn't. However, we argued in the alternative. We said that the license – we had standing under the exclusive license in the initial pleading. But even if we didn't and we don't believe the court should even go there, but if the court wants to go there, we have standing. And here's the reason why, and we laid out the reasons why. We argued in the alternative, and then we said, but even if the court doesn't believe we didn't have statutory standing in the initial pleading, we have it now. Excuse me. Because we've amended our complaint, and we are now an assignee, and under the Lanham Act, we therefore have. And what is the practical difference, if we were to accept your argument, between your recovery under these two provisions of the Lanham Act and the one where the court said you didn't prove profits to disgorge? I'm not following. You're asking – In other words, the court dismissed the 32 and the 43-1 or something like that. 43-C. But the court did not dismiss the other complaint. Right. And he ruled summary judgment against you because you couldn't prove profits. That's what he said. And all I'm saying is what extra benefit is there if we revive those other two claims? Because – okay, when the court dismissed the 32 – the section 32 claim and the section 43 claim, the only two claims that Neutron Depot had left were the section 43-A claim, which is the unfair competition claim, and we had the common law trademark infringement claim. That motion for summary judgment that they filed on the disgorgement of profits was on that 43-A claim. So if the court reverses the standing issue and – No, but I'm saying just statutorily. Right. What damages are available for infringement that are not available for the unfair competition? Well, under the statute, under 15 U.S.C. section 11 – 17, a plaintiff in a trademark infringement can – is allowed – is entitled to actual damages, the disgorgement of profits, and costs. Now, in quick technologies, the court has laid out a roadmap for when the district court is to allow a disgorgement of profits. And one of the ways that – one of the factors is whether the defendant had the intent to confuse or deceive. And during the deposition of the defendant's corporate representative, Mr. Rattar, Mr. Rattar admitted in his deposition that bank – it was Bankrate's general corporate policy to permit its software algorithm to use others' trademarks. And then when the trademark owner finds out and complains, they immediately back down. They don't fight, and they take down the ad. Now, under – Okay. Let me – maybe this is the same question Judge Jones is asking, but I just don't understand it anymore. The district court granted summary judgment on this point that you're talking about, right, on disgorgement, finding evidently that there's no material – there's no genuine issue, material fact on the willfulness component. Right. Right. Okay. Assume we affirm that. We think that's correct. I thought what Judge Jones was acting about is on the other claims on which the district court ruled no statutory standing. What's the difference? In terms of damages, what would you get? Counterfeiting. We are allowed under the Atlanta Act to get statutory damages. What are those? That's in the discretion of the court. And it's – I think the statute says $750 to $30,000, I believe. And if it's willful, the district court can go all the way up to $150,000. So you can get statutory damages under the counterfeiting portion of Section 32. So you want to send this back to Judge Sparks and now it is discretion. Where would you put it? Well, interestingly, Judge Sparks is not the judge anymore. Before this case came up to the Fifth Circuit here, the parties agreed to allow the magistrate judge to hear the case. So Judge Sparks, it's my understanding, will not be deciding this case anymore.  So in regard to that as it may, the finding, the willfulness finding on disgorgement is a separate issue. You're asking us to reverse the summary judgment on that, saying that there's a genuine issue of material fact as to that. Right. Okay. But your answer as to what difference does the damages on the other claims make is the statutory damages under those sections. Right. Under Section 32, a plaintiff is allowed to – or is entitled to statutory damages if you can prove counterfeiting. So you've got your regular service mark infringement claim, but if you can prove what the statute says, you then are entitled to statutory damages. And we believe we can prove that. So in regard to the first issue I was talking about, which is the court's decision in the statutory standing analysis, we believe the court erred in applying the time of filing rule. This court has – there is no case, and the bank rate has cited no case that says time of filing rule applies in statutory standing analysis. None. Are there patent cases that support there? I thought they cited some patent cases that support their view. Those are from the Federal Circuit and the Second Circuit. And why shouldn't we view those as persuasive since we evidently don't have any cases on it? Well, here's the thing. In those two circuits – and we've cited this in the brief – those two circuits say that statutory standing is a jurisdictional question. Morrison says that, and then Mentor HS, Inc. says that. That's not the law in this circuit. The law in this circuit is statutory standing is not jurisdictional. It's merit-based. And so those two – this court should not follow those two cases because those two cases say that it's jurisdictional. It's not jurisdictional here. And your best case for that is the case you mentioned earlier, 16 Front Street or – Right, 16 Front Street and Blanchard 1986 limited. Blanchard says that statutory standing in the Fifth Circuit is merit-based. That's what Blanchard says. And then Mentor HS and the other one I cited, Morrison, in the Federal Circuit and the Second Circuit specifically say those are – those circuits, statutory standing is jurisdictional. So I see my time is wrapping up here. I'll start my second issue unless the court has a question, and then I'll go on to the third issue I guess when I come back up here in my time remaining. The court imposed sanctions on Neutron Depot, and the court cited one sentence for doing so. It says the court dismisses these claims with prejudice because there's ample evidence Neutron Depot has attempted to manipulate standing – the standing issue in bad faith. That's all the court says. And with that, I see my time is up, so I'll continue. Okay, thank you. Excuse me. Ms. Cawley? May it please the court. The district court properly dismissed the standing claims because Neutron Depot did not have statutory standing at the time it filed the complaint. I'm sorry, the Lanham Act Section 32.1 and 43C claims. Neutron Depot was not a registrant, owner, or assignee of the mark when it filed its complaint in May 2014. That's what's required under those sections of the Lanham Act in order to bring a claim. Neutron Depot disavowed its argument that it was an exclusive licensee in its briefing before this court. It seems to be reviving that argument now, but the district court properly found that the license agreement was not tantamount to an assignment, which is what's required in order to have statutory standing under those provisions of the Lanham Act. So what's really an issue here is whether the assignment to the mark that it received in December 2016 can retroactively cure the lack of statutory standing that existed in May 2014 when it filed the complaint. It cannot. As an initial matter, the assignment in December 2016 does not assign prior claims. So the record is clear that in this case, any alleged infringement stopped in May 2014. An assignment that's not even effective until December 2016 cannot allow Neutron Depot to pursue those claims against Binkrate that ended in May 2014. What do you mean it didn't assign? Are you saying in terms it did not assign pending claims or past claims? That's right. Could it? Could it? It could have, but it did not. Well, I mean, what good would the statute be if—isn't one of your arguments pretty much prudential that you can't allow mid-litigation transfers like this to occur? And if you could have an assignment of past claims, wouldn't that effectuate exactly what you're saying is not a good idea? Yes, Your Honor. So let me clarify my answer. The assignment could have assigned past claims. It still would not have fixed the statutory standing issue in this case for the reasons that you've mentioned. Allowing a mid-litigation assignment would inappropriately expand the class of plaintiffs who can sue under those provisions of the Lanham Act. It would allow plaintiffs to file placeholder litigation to anyone who says they might eventually be assigned the mark in the future. That's inappropriate. A plaintiff needs to possess rights before it can try to vindicate them in court. Allowing otherwise would lead to gamesmanship, undue delay in expense, and the litigation of abstract disputes. Neutron Depot has not cited a single case that supports its position that a mid-litigation assignment should be able to retroactively cure standing. But if I understood what you said to Judge Jones, are you saying that we would not have to reach that issue if the actual assignment in this case didn't include the pending claims? Yes, Your Honor. Is that right? I think you can rule on that narrow issue because of the facts of this specific case and that assignment. Okay, and we can look to . . . where do we look in the record to parse that out, whether the assignment actually . . . I mean, I'm sure it's in there. I was just curious if you had any specific language that you could point us to. I do not believe I have the assignment in front of me up here, but it does not specifically call out past claims. It says that they may sue and they'll be the ongoing owner of the mark, but it does not say anything about assigning past claims to the mark. And allowing otherwise without a clear assignment of past claims would lead to the fear of duplicate litigation. The assignor could come back and say that it has the ability to sue on those claims in addition to the new assignee claiming the ability to sue on those claims. So it would need to be a clear assignment of the past claims. It doesn't exist here. But as I said, even if it did exist, for all of the policy reasons I mentioned, it should not be permitted to cure a statutory standing problem that existed when the complaint was filed. And as Judge Duncan pointed out, there are other courts that have held that a mid-litigation assignment cannot retroactively cure a statutory standing problem. The Federal Circuit is the main one because it is faced with these IP statutes more frequently. It has held that in both the patent and trademark context, that a mid-litigation assignment cannot retroactively cure a lack of statutory standing. In the Gaia case, the Alp South case, and others. And in those cases, those were nunk-pro-tunk assignments. So they are actually backdated to before the date the complaints were filed. The court still held that was not sufficient to retroactively cure the standing problem. Here, the assignment is not backdated. Its effective date is December 28, 2016. So it certainly cannot retroactively cure the problem. Now, Mr. Peacock said that our circuit law is different from the Federal Circuit with respect to whether the statutory standing issue is jurisdictional or merits-based. I think that's the argument. What's your response to that? I don't believe there is actually a difference in the circuits on that point. I think before Lexmark International, different circuits used different terminology when addressing this issue. After that case, they've started coming into line and using the same statutory standing language. But if you look at the Federal Circuit cases, it does say it's a jurisdictional inquiry. But they also clearly look at, for example, the Patent Act or the Lanham Act, look at the language and see whether the plaintiff has standing to sue under those statutes. The only difference would be whether the court dismissed under 12b-1 or 12b-6, right? And since the court can take evidence on 12b-1 and we allegedly have evidence of the assignment here, that's it. That's right, Your Honor. So in your view, Lexmark was a 2014 case. It doesn't change the validity of the Federal Circuit cases that you're relying on? I don't believe so. The Federal Circuit acted consistently. And the policy reasons apply, whether it's looking at it under a jurisdictional or a statutory standing rubric anyway. So turning to the issue of damages, the district court properly evaluated various factors that the Fifth Circuit has held should be evaluated when determining whether or not a disgorgement of profits would be equitable under the Lanham Act. The district court looked to whether there was a diversion of sales from the plaintiff to the defendant, whether there was palming off, and whether there was an intent to confuse or deceive. On the first factor, diversion of sales, there's no evidence in the record that there was any diversion of sales. Why don't you tell me what are the respective businesses of these companies? I mean, this whole thing is extremely confusing to me factually. You know, for any—I mean, I assume that a number of companies nowadays are using algorithms to pop up with keywords, right? That's right. So there must be trademark infringement going on all over the place at the present time. Actually, Your Honor, as Mr. Peacock mentioned, this case never got to the liability phase, but that's not infringement. Many courts have held that using trademarks as keywords is not actually trademark infringement. But going back to your original question about whether or not—or what the business models are of these companies, the record is not completely clear as to plaintiff's business. Mr. Peacock can address that more directly. My understanding is they sold insurance products of some kind. Bankrate was just an insurance lead collector. So they would place ads on the Internet for people who were interested in getting some kind of insurance, collect their names and contact information, and then sell those leads to a different company that actually sold goods and services, which is the reason the district court found there could not be any palming off in this case, because Bankrate did not sell any goods or services. So there was nothing for it to palm off as the goods or services of Neutron Depot. And finally, on the issue of willfulness, there is no evidence in the record to show an intent to confuse or deceive. Neutron Depot produced one snippet of deposition testimony to try to create a genuine issue of fact on that point, but the deposition testimony does not provide any evidence that Neutron Depot knew about this particular trademark, which is necessary in order to find willful infringement. As this court found in the Streamline case, if there's no evidence the defendant knew of a mark, there can't be willful infringement. Did the plaintiff settle with the other defendants? Yes. How come you didn't settle? I wasn't involved at the district court level, Your Honor. But I believe that Neutron Depot is interested in collecting the profits that it's seeking in this case, which is, I believe, $22 million. So, again, on the issue of willful infringement, the evidence in the record just does not show any intent to confuse or deceive. In other cases before this court, the Streamline case and the Texas Pig Stands case, even where a defendant knew about a mark and used it anyway, the court found that there was no willful infringement because there was no attempt to profit off the plaintiff's mark. Here, there's no evidence that Bankright knew of the mark. And when it did learn of the mark, as Mr. Peacock conceded, it immediately stopped bidding on that mark. So there's no evidence of willful infringement. And as this court has held in the Retractable Technologies case, if there's no evidence of diversion of sales and no evidence of palming off, the plaintiff faces an uphill battle trying to get a disgorgement of profits. Here, there is no such evidence, no diversion of sales, no palming off, no actual damages of any kind, and also no evidence of willful infringement. So if the court does not have any additional questions, I'll just— Sanctions? Your Honor, it's our position that the dismissal with prejudice is not a sanction. The district court never said it was issuing sanctions in this case. And as Neutron Depot stated in its own briefing, under Rule 12b-6, which is the rule that this court dismissed the case under, dismissal with prejudice is as a matter of course. So it properly dismissed the case with prejudice. If there's nothing else— I guess not. I'll just say, in sum, we would ask this court to affirm the district court's holding. Thank you. Thank you. May I proceed? Thank you. I wanted to rebut some of the things that opposing counsel said. She left off on sanctions. Excuse me. I'm sorry. This is the first time in this court that Bankrate has said they're not asking for sanctions. A review of the record reveals that in the motion they filed, they asked for sanctions. They asked the court not only to dismiss the lawsuit but to do it with prejudice. And they said the reason the court needed to do it with prejudice is because we had done a lot of bad things. They alleged that we forged documents. They alleged that we fabricated documents. They alleged that we were hiding documents. That's all in the record. And so for them now to come here and say, oh, there's no—we don't even know what Mr. Peacock's talking about, about sanctions. What is he talking about? The record is replete with stuff where they just constantly accuse us— Well, if the difference is between dismissal with prejudice and dismissal without prejudice, had it been a dismissal without prejudice, what would you have done? Well, as a matter of law, since we were past the statute of limitations, even if the court would have done it without prejudice, effectively it would have been with prejudice. Okay. So—but the—I'm sorry. Isn't that all she wrote? Isn't— What more is there to say about what is reversible error in that ruling? The court didn't follow Tilopian. As we mentioned under brief, the court— But it's harmless error. Well, no, it's not. I respectfully disagree, and here's the reason why. The Lanham Act is built on equity. When the court decides— The statute of limitations is not equity. No, but the court—if the court reverses the standing issue and the Section 32 claim goes back, one of the—which we were talking about earlier, one of the damages is going to be statutory damages. It's in the discretion of the court, and the court can look at the record, and if the court has imposed sanctions on us, the court can say, well, you know what? I'm not going to award much money here, maybe the minimum amount, $750, because of all these bad things that the plaintiff did. Again, what—I mean she said, and if so, I'd forgotten this, that your client is claiming $22 million in lost profits. Well, Your Honor— And now you're going after $750. Well, Your Honor, that's what my client would like, but it's up to a jury. I mean, of course, all plaintiffs want billions of dollars, but it's up to a jury, and all we're asking for is let a jury decide. That's what we're asking. Now, in regard to the other item that opposing counsel talked about, about the mid-litigation assignment, the non-proton issue, what we need to be aware of is there's two different types of—actually, three different types of standing, prudential, statutory, and constitutional. What they're trying to argue is that we shouldn't be allowed to retroactively do this. That falls under constitutional standing. Let me ask you a question. Since you're the client—there are two companies here, and both of them are apparently wholly owned by one individual. So what prevented that individual from simply executing the assignment or filing in the—executing the assignment as apparently was represented to the court time after time after time? Well, number one, Your Honor, no one represented CSI who was the owner, and the court could have ordered that CSI come into the litigation initially. The court didn't do that. Well, it's not for the court to decide who the plaintiff is. It's for the plaintiff to decide that. Right, and the plaintiff did decide. But if they wanted to bring in CSI, they could have moved the court to do it, but they didn't. Why would you do that? Well, why would they do that? Why wouldn't—yeah. Because they believe that— Hey, plaintiff, you've sued the wrong—you're not the right plaintiff. I insist that the right plaintiff get in here right now. Your Honor, again, we're missing the forest to the trees respectfully. We amended our complaint, so what—this court—the district court should have looked at the amended complaint in regard to statutory standing. And in regard to an injury in fact, which is what a constitutional standing would look at, maybe the bank rate might have an argument about that. But in terms of statutory standing, they don't. Statutory standing has a different argument—different elements than constitutional standing. They sure do, but you've got it backwards. All you have to have with constitutional standing is jurisdiction when the judgment is entered. And when we talk about a cause of action, you ain't got anything to retrospect. It's not that complicated. It's just a confusion that flows from using the word standing, statutory standing, which is really very misleading. I agree. And that seems to me to have infected a lot of the analysis, quote, analysis here. But I appreciate your argument. Thank you. All right. So the court will stand in—